Allread, J.
We do not deem it necessary to discuss all of the numerous questions presented in the record or suggested by counsel. Those only which are considered important will be adverted to.
The validity of the bill of exceptions taken upon the trial of the cause is challenged upon the grounds following:
1st. That it was not properly presented:, allowed and authenticated.
2nd. That it does not purport to embody all of the evidence.
3rd. That the bill of exceptions as allowed is not true.
To sustain the claim that the bill of exceptions was not properly allowed or authenticated, it is proposed to show that *509 the trial judge was not present in Miami county on the date of the journal entry, and hence could not and did not make the order authenticating the bill of exceptions.
Without deciding whether it is necessary for the trial judge to approve or. allow the entry of authentication in open court, it is sufficient in this case that it appears from the record, as certified, that the order was made in open court and is regularly on the journal of that court; hence the remedy, if any, is by application in the court below in the first instance to strike such entry from the journal. Sedam v. Meeksbach, 6 C. C. 219.
No extrinsic evidence can be received' here to dispute the record. Heddleson v. Hendricks, 49 Ohio St. 297; Sedam v. Meeksbach, supra.
It is further contended that the bill of exceptions was not allowed by the court or filed within the time provided by law.
The facts shown by the record are that the bill was presented to plaintiff’s counsel on the thirty-third day after the overruling of the motion for a new trial, and to the trial ■judge on the forty-first day thereafter, who extended the time for allowance ten days beyond the fifty days by endorsement on the bill.
On the fifty-ninth day after the overruling of the motion for a new trial, the bill was signed by the trial judge. On the evening of the succeeding day it arrived by express in the city of Troy, Miami county. The clerk’s office being closed, and the messenger not being able to find the clerk, the bill was retained until the following morning when it was deposited with the clerk.
On the same day, being the sixty-first day after the overruling of the motion for a new trial, an entry authenticating the bill of exceptions was placed on the journal, which,among other things, contained the following: “And thereupon said court on the 11th day of March 1895, allowed said bill of exceptions, and did thereupon sign the same and ordered it *510 to be made part of the record of the case. * * This entry is in fact made the 13th of March 1895, (being the sixty-first day), and this day spread upon the journal, but by order of the court through the telegram hereto attached, is placed on the journal as of March 11, 1895.”
Section 5302 requires the bill to be alllowed and signed (where the ten days extension is allowed) within sixty days after the overruling of the motion for a new trial and provides: “The bill of exceptions shall be filed with the pleadings * * * and an entry of the allowance and signing of the same must be entered upon the journal within the time provided for such allowance and signing.’
The former practice required the journal of the court to be kept open for thirty days after the trial term adjourned, and that the entry of authentication be entered thereon as of the term.
It was then held that a compliance with this section was necessary to make the bill of exceptions available. Hill v. Bassett, 27 Ohio St. 597; Burk v. Ry. Co., 26 Ohio St. 643.
But it was held that where the order authenticating the bill was actually made within the proper time,the trial court had power thereafter to substitute such entry nunc pro time. Bothe v. Ry. Co., 37 Ohio St. 147; Mitchell v. Thompson, 40 Ohio St. 110; Toledo v. Preston, 50 Ohio St. 361; Cleveland Leader Printing Co. v. Green, 52 Ohio St. —.
The provisions of the act of March 22, 1892, concerning the entry of authentication, made to conform to the amendments as to time for allowing the bill, ought not to be construed so as to charge the party excepting with the duty of having the entry actually entered upon the journal.
When he procures his bill to be signed and allowed, and the order of authentication actually made, it becomes the duty of the clerk to enter it upon the journal, and if he fails to do it, the party ought not to be without remedy.
This provision, therefore, of section 5302, does not, in *511 the opinion of the court, supercede the power of the court to make the entry of such order of allowance nunc pro tunc.
That, in our judgment, is the effect' of this entry, and we are bound to presume from the state of the record that the trial judge had before him, such state of facts as justified the entry of the order nunc pro tunc, and therefore such entry has the same effect as if it had been entered upon the journal on the 11th day of March, 1895, which was within the time provided by law for the allowance and signing of the bill.
The filing of the bill of exceptions within the time for allowance, etc., is not essential to its validity. Section 5302 has not been materially changed as to its construction in that regard since the decision of Patterson v. Mayer, 31 Ohio St. 103, which holds that the mere omission to file the bill with the clerk during the term will not invalidate it. It is there said that “when duly perfected and ordered to be made part of the record, it is in law to be regarded as part of the record, whether it come into the actual possession of the clerk during the term or not.” The expressions used by the learned judge delivering the opinion in the case of Young v. Shallenberger, 34 W. L. B. 166, were made with reference to the facts of that case, and do not conflict with the doctrine announced in Patterson v. Mayer, supra.
It is also claimed that the various exceptions complained of not having been reduced to writing at the time, are not available herein the absence of an order giving time “to reduce the same to writing not beyond fifty days after the overruling of a motion for a new trial.”
If the provisions of section 5298 alone governed, a strict construction might justify0such contention, but when taken in connection with the provisions of other sections relating to bills of exceptions, we can not see how such construction can fairly be given.
Prior to the recent amendments section 5298 provided, *512 “The party objecting to the decision must except at the time the decision is made, and time may be given to reduce the exceptions to writing, but not beyond the term.”
Section 5301 then provided that in cases where the decision was not entered on the record or the grounds did not sufficiently appear in the entry,or the exceptions were to the opinion of the court on a non-suit, or upon a motion for a new trial, etc., “the party excepting must reduce his exceptions to writing, and present it to the court for allowance.” Section 5302 required the court, if the exceptions be true or after correction, to allow and “sign it before the case proceeds, or, if the party excepting consents, within thirty days after the term.”
In the case of The State ex rel. Otenberger v. Hawes, 43 Ohio St. 16, exceptions were taken during the progress of' the trial, and also after the verdict, to the overruling of a motion for a new trial. Counsel being unable to complete their bill of exceptions before the adjournment of the court, requested an extension of thirty days, and that the journal be kept open for the purpose of perfecting such bill. This-was denied on the ground that the trial judge wished to break up the lazy habit of postponing of bills until the last day of the term. On the same day the court adjourned. The bill was presented four days later, and the trial judge refused to allow it.
Johnson, J., deciding this question, says: “The effect of section 5302 is to extend the time for the performance of this duty (i. e. signing and allowing of the bill of exceptions) within thirty days after the term, with the consent of the exceptor. * * We hold that the relator upon the facts stated, had the same right to .present his bill within the thirty days as he had during the term, and that it was the duty of the court, if the bill be true, or, if not, then after it is corrected, to allow and sign the same.”
If the provisions of section 5298 as it then stood had con *513 trolled, and if the construction contended for here had been given, the trial judge there would not have been compelled to sign the bill of exceptions after the term. But, as there held, the provision of sections 5301 and 5302 imperatively required him to sign a true bill within thirty days after the term.
The recent amendments do not destroy the force of the Hawes case as a guide in the construction of the provisions of these sections as they now stand. The purpose of these amendments was to better secure to the parties, reasonable time and opportunity for the preparation and examination of the bill of exceptions taken during the progress of a trial; and in cases where, as provided in section 5301, “the decision is not entered on the record or the grounds of exception do not sufficiently appear in the entry, or the exception is to the decision of the court on a motion to direct a non-suit, or to arrest the testimony from the jury, or for a new trial for misdirection by the court to the jury, or because the verdict,- or if the jury is waived, the finding of the court is against the law and the evidence, or for the admission or rejection of evidence,5 ’ and the exception is not reduced to writing during the progress of the trial, the party excepting is entitled to fifty days from the overruling of a motion for a new trial, in which to have his bill of exceptions allowed by the trial court, subject to the conditions prescribed therein of presenting it to the opposite counsel within ten days, and to the trial judge within five days preceding the expiration of the fifty days, and subject also to the power of the judge to grant an extension of ten days beyond the fifty days.
In the case of Young v. Shallenberger, supra, these sections were considered, and it was there held that the trial court had discretionary power under section 5298, to fix a shorter period than fifty days for reducing the exceptions to writing, but that the time for the allowance of the bill as fixed by sections 5301 and 5302, can not be reduced by *514 the court. And an order of the court fixing the time for the signing and allowing of the bill was construed as fixing the time for reducing the exceptions to writing.
In the case at bar the court did not limit the time for reducing the bill to writing, and in the absence of such order the full statutory period would be allowed, subject to the condition of presentation to counsel and the court within the prescribed time prior to the expiration of the fifty days.
It is next insisted that the certificate of the trial judge does not show that the bill' of exceptions allowed upon the trial is a true bill, or that it embodies all the evidence in the case. The certificate of the trial judge attached to the bill of exceptions is as follows:
“And the defendant therupon prays the court here to sign and seal this its bill of exceptions, and order the same to be made a part of the record in this cause, but not spread upon the journal; all of which is done and ordered this 11th day of March, A. D. 1895.“
“Before signing this bill of exceptions I call attention to the matters complained of by plaintiff’s counsel in 118 objections to said bill, filed February 22, 1895. As to some few of them my own memory sustains said counsel, and I have at different places in said bill made emendations in my own hand writing. Other matters I call attention to here, there not being any place left for their insertion in the body of the bill.
“1st. Said bill does not show the fact that upon the trial of this case in the month of November, 1894, after the impanelling of the jury, and before the offering of any oral testimony, the court sent the jury under the charge of the court constable, P. J. Goodrich, under the usual cautions, admonitions and instructions of the court, to which no exceptions were taken by either of the parties to this case, to view the locality of the line of railroad known as the Piqua & Troy Branch B. B.. Also the various pieces of property claimed to have been purchased by the plaintiff, for the defendant. Also the way and manner in which said railroad is located upon said lands, and also the location of said railroad *515 with reference to the east bank of the Troy Hydraulic canal. That said jury did in fact under charge of said constable, view the said premises, and that no exceptions were made by either of the parties to this case to the manner of said view.
“2nd. It does not sufficiently appear in said bill that during the trial there was produced and read to the court certain documents alleged to be under the control of the defendant, which motion had been heard to another judge of this court, previous tc this trial, and found by him to be true,and an order made by hin} for their production,and the further order of this trial judge upon this third trial of this case, for their production before the court, and of the failure of the defendant to have produced some of those called for by plaintiff, all of which ought to have been inserted in full at the point marked by asterisks, or rather x’s, on page 250 of this bill. I only remember the substance, but not all of the details of said matter.
“3rd. It is my recollection that the charges of the court upon the second trial of this case, were not offered in evidence in this third trial, and how they appear, I do not know, except being attached to the bill of exceptions of the second trial, they inadvertently crept in, and they must therefore be eliminated from this bill.
“4th. There are certain crudities in the bill as to what the court ruled on some few occasions, but I do not attempt to correct them for the reasons which will immediately appear.
Having gone through the entire list of objections,and examined this bill with reference thereto I am not able to state from memory whether or not there are other enlargements or emendations of the record in said bill, the trial having continued through five weeks, and there having been almost continuously, cross-remarks between opposing counsel, and I could not undertake to tell what further corrections, if any,I could make without the aid of both stenographers, Miss Edgar for the defendant, and Mr. Grosvenor, the court stenographer in this case, with their original notes to compare with each other, and as I have spent all the days and late at night since the bill came into my hands until now, at the close of the sixtieth day, there Is no time left for that. Therefore except as herein allowed and corrected, each and every of said objections of plaintiff’s counsel are overruled by me, to which *516 ruling each and every one exceptions were taken by said plaintiff’s counsel. Counsel on both sides except to said corrections, defendant’s counsel because not being correct, and plaintiff’s counsel because of their not' being full enough as they claim in some particulars, and said plaintiff’s counsel also excepts for the further claim that the bill ought not to be signed at all, as not having come into their hands within the time limited by law, which they offer certain affidavits to support.
“And now counsel ask me to fix a time not exceeding fifty days from this date for the preparation, allowance and signing of a bill of exceptions to the various matters now here done by me, including the signing of this bill, and accordingly the court fixes the 30th day of April, A. D. 1894, as said limit of time, being fifty days from this date.
“Signed and sealed this 11th day of March, A. D. 1895.
“John C. Miller, Judge of the Court of Common Pleas, and trial judge in the above entitled case. ’’ (Seal.)
This certificate is somewhat involved and obscure. The first and third statements, however, may be fairly construed to correct the bill of exceptions in the particulars named.
The second statement relates to a proceeding for the production of certain documents which the defendant below failed to produce. The proceedings were before the court, and were not evidence in the cause. It is not alleged by either party as prejudicial error. The plaintiff below obtained the order he sought, and, of course, could not complain so far as the action of the court is concerned. The defendant below failed to regard the oi’derfor the production of the papers. It wras the duty of the plaintiff below to resort to the remedies provided by statute in such cases, and if the trial court would then refuse to act, he might be prejudiced. We are unable, as the case stands, to see how the proceedings before the court necessarily belong in the bill of exceptions.
The trial judge suggests in his fourth statement that there are certain crudities in the bill, and undertakes to make a statement of what those crudities are. He says that he has *517 gone through the entire list of objections made by the plaintiff below, and examined the bill with reference thereto, and is not able from memory to state any enlargements or emendations to the bill, and could not undertake to tell whether any further corrections could be made without the aid of both stenographers to compare their original notes, and not having time for that, he overrules further objections to the bill. We think by an examination of this statement the crudities suggested by the trial judge are artificial. He sees proper to set forth upon the record the amount of energy, and patience and time,'"and care given to the examination of the bill, and in substance says that having used all the time afforded him by the statute, he is unable to state wherein the bill of exceptions might be enlarged or corrected. It is certainly not for us to say that it still would have been the duty of the trial judge to have procured the assistance of b.oth stenographers and compared their notes. The trial judge himselfJraving discharged this duty to his satisfac* tion, having exhausted the time given him by law in its examination, and having then overruled all objections except where corrections were made, and having signed and certified the bill, and caused an entry of allowance to be placed upon the journal, it is not our duty to say in contradiction to his certificate and the journal entry of the court, that the bill is not a true bill.
Counsel for the plaintiff below, at the time their objections were presented to the trial judge, undertook to sustain the same by the affidavits of counsel and others, and when their objections were overruled and the bill was signed, the plaintiff below excepted, and thereafter attempted to perfect and have allowed against the objection of plaintiff in error, a bill of exceptions purporting to be their exceptions to the action of the trial judge in allowing as true, the bill of exceptions taken upon the trial of the case.
*518 There is no authority for such latter bill of exceptions. Such practice would lead to great confusion. Bills of exceptions if such practice prevailed would be taken to the orders allowing each successive bill of exceptions ad infinitum.
The certificate of [the"trial judge that the bill is true, is conclusive. State ex rel. Hawes v. Beckman, 4 C. C. 246; State ex rel. Atkins v. Todd, 4 Ohio, 351.
Having disposed of these objections to the bill of exceptions, we may now consider some of the more important errors claimed by the plaintiff in error as a ground for a reversal of the judgment.
The plaintiff in error requested the trial judge to discharge the jury and proceed to try the cause.
It is clear to us that the issues made in the cause upon the petition were triable to a jury. While it is true that the cross-petitions were equitable in their nature, yet they did not extinguish or supercede the case made in the petition. Buckner v. Mear, 26 Ohio St. 514.
The main grounds of error claimed by the plaintiff in error are: First, that the contract as claimed by the plaintiff below is against public policy; and, second, that the contract as claimed by the plaintiff in error is not supported by the evidence. The question of public policy is made by the record in various ways, mainly, however, by the demurrer to the replies, the motion filed by defendant below to take the case from the jury and for a judgment in their favor upon the close of the plaintiff’s testimony, and by the charge of the court. It is not entirely clear that the question of public policy is fairly raised by the demurrer to the reply, and we will therefore consider the case as it stood when the defendant below made its motion at the close of the plaintiff’s testimony. It will be remembered that the plaintiff below sought to recover for moneys expended and for services rendered under a contract made about the month of April, 1885. He claims that from the time he entered the *519 employ of the defendant below, he devoted substantially all his time and energy to the securing of the right of way from West and Clay streets in the city of Troy,through the city of Troy northwardly to a point some distance beyond, known in the history of the case as ‘ ‘Statler’s south line. ’ ’ That these services continued for something over three years. Morris was a member of the council of the city of Troy from April, 1885, until April, 1887. That, beginning in April, 1885, until April, 1886, Morris was active in council in securing to the Piqua & Troy Branch, rights of way over the streets and alleys of the city of Troy. He introduced and supported a resolution to open up Raper street and Hydraulic avenue. Proceedings were instituted to widen Raper street to meet the demands of the-company. Morris introduced and supported and voted for resolutions and ordinances extending and opening up Hydraulic avenue soutiiwardly and eastwardly to meet the proposed line of railway, at a cost to the city o'f from six to eight thousand dollars, and granting to the Piqua & Troy Branch Railway Company without cost rights of way thereon. He introduced and supported an ordinance granting rights of way over Market, Mulberry and other streets to such railway company. From the very nature of the case these rights of way acquired from the city, were of prime necessity to the railway company. From the correspondence introduced during the testimony of the plaintiff, it appears that the acquisition of these franchises from the city was the foundation for any steps whatever being taken by the company to build the road. The letter of Morris to Waite, dated October 7, 18S5, estimates the cost of the right of way at $12,-000. but he says: “At a meeting of city council (last night) an ordinance was adopted, granting the right of way to T. & P. B. R. R. over Raper street and all streets crossing from West street to Garfield avenue. A resolution was also adopted, requiring proceedings to be immediately instituted on behalf of the city to condemn property to open streets *520 and avenues from West street to Main street. This will be done at the expense of the city, and if successful, the estimate (above $12,000) will be reduced probably $5,000, leaving the amount for damages and right of way from West street to township line about $7-, 000. 3 3 From that time on it was assumed by Waite, representing the railway companies, and Morris, that the city of Troy would condemn and open Hydraulic avenue at the expense of the city, so that the cost to the railway company would be reduced to $7,000.
Morris in his letter of November 15, 1885, says: “I have had a hard struggle to accomplish what has already been done — -right of way on Raper street, building of avenue, etc. - — and to accomplish more would, in my judgment, be impossible. ” And then proceeds to state what had been done as to the acquisition of other rights of way. It having been discovered that Raper street was only twenty feet wide, the railway company insisted upon a right of way sixty feet wide. In that connection Morris, in his letter of December 9, 1885, says: “Now Raper street is but twenty feet wide when opened, and acting upon your telegram, I introduced last night and had passed an ordinance changing the line of the avenue sixty feet in width to St. Clair avenue, so as to have it terminate near the junction of Plum and Grant streets.3 ’ The letter of February 9, 1886, of Morris to Waite, also carries out the same idea, to-wit: that the railway company was insisting upon their franchises from the city as the foundation of their proceeding in the matter of constructing the road.
Now, if we adopt the theory contended for by the plaintiff to support his causes of action, that from April, 1885, on, he was in the employ of the railway company, it would be to assume that Morris was engaged in serving two masters. As a member of council he would represént the interests of the city, and as an agent of the railway company he would *521 be interested in securing these franchises from the city upon as favorable terms as possible. These attitudes were inconsistent. The city was entitled to the benefit of his unbiased judgment, his energy and his business capacity as a member of its council. The granting of these franchises to the railway company was an important transaction on behalf of the city. The question, therefore, is: is such contract against public policy? It is said by high authority: “In law as in morals, it may be stated that as a principle, no servant can serve two masters, for he would either hate the one and love the other, or else he would hold' to the one and despise the other. ’ ’
It is well established in all the repdrted cases that a contract against the policy of law will be given ‘ ‘ no countenance or assistance in fori civili.'' ’
Lane, J., says, in the case of Spurgen v. McElwain, 6 Ohio, 444: “The principle is of general application that contracts contrary to sound morals, public policy, or forbidden by law, will not be executed by courts of justice,”
It is said by Lord Mansfied: “No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act.” And again in the same case (Cowp. 341) “whenever an agreement appears to be illegal, immoral, or against public policy, a court of law will leave the parties as it finds them.”
It is not material in this case to inquire whether the franchises actually granted by the city were beneficial to the city or otherwise. It is not a question as to whether the contract was a good or bad one, but the courts look only at the tendency.
Greenhood, in his work on Public Policy, on page five, says: ‘ ‘ The question of the validity of the contract does not depend upon the circumstance whether it can be shown that the public has in fact suffered any detriment therefrom, but whether the contract is in its nature such as might have been injurious to the public.”
*522 In the well considered case of Piatt v. Longworth, 27 Ohio St., which involved a sale made by an administrator to a relative, the administrator having some secret interest, Johnson, J., says, on page 195: “In such cases the court will not suffer itself to be drawn aside from the application of this equitable rule by any attempt on the part of the purchasers to establish the fairness of the purchase,because of the danger of imposition and the presumption of fraud, inaccessible to the eye of the court.
“The policy of the rule is to shut the door against temptation in cases where this relationship exists; it is of itself deemed sufficient to create the disqualification. The sale will be set aside, not because there is fraud, but because there may be fraud.”
This principle is well stated by Elliott, J., in the case of Elkhart County Lodge et al. v. Curry, 98 Ind. 208: “A wholesome rule of law is that parties should not be permitted to make contracts which are likely to set private interest in opposition to public duty or to the public welfare. * * * It is not necessary that actual fraud should be shown, for a contract which tends to the injury of the public services is void, although the parties enter into it honestly and proceed under it in good faith. The court does not inquire into the motives of the parties in the particular case to ascertain whether they were correct or not, but stop it when they ascertain the contract is opposed to public policy, nor is it necessary to show that any evil was done by or through the contract. The purpose of the rule is to prevent persons from assuming position where selfish motives may impel them to sacrifice the public good to private interests. ’ ’
The evil tendency of a contract with a member of council to assist a railway company in the procurement of rights of way over the streets and avenues of the city its apparent.
And as stated by Williams, J., in the case of Kahn, Jr. v. Walton, 46 Ohio St. 207, quoting from Lord Mansfield: “If from the plaintiff’s own stating, or otherwise, thejcause *523 of action appears to arise ex turpi causa, or the transgression of a positive law of this country, there the court says, he has no right to be assisted., It is upon that ground that the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. ’ ’
So that in the case at bar, whenever it appeared from the plaintiff’s own stating, or otherwise, that the cause of action was against public policy,it was the duty of the court to dismiss the action. It is, however, claimed by the plaintiff beT low to avoid the question of public policy, that it had been determined by the council of the city of Troy, and even by the council of the village of Troy before it became a city, and by each member of the council individually, that HyT draulic avenue was to be dedicated and devoted to railroad purposes, and that the action of Morris in supporting and voting for these various resolutions granting rights of way, was merely formal and in compliance with such previous agreement. There was no agreement by the council of the village of Troy, or of the city of Troy, which would have required absolutely, the passing of these ordinances. Whatever may have been the individual agreement of the members of the council, it would not have prevented the council when in session and acting as a body, from refusing to grant these franchises. McCortle v. Bates, 29 Ohio St. 419.
It was the duty of such members of council to exercise their best judgment when the matter came before them in session, and whatever may have been their previous views or agreement, they had a right to change their mind and vote in accordance with their then judgment. Fuller v. Dane, 18 Pick. 472.
The more serious question in this connection is, whether public policy would prevent recovery of moneys advanced for rights of way as claimed in the first cause of action. The rule is laid down that where a contract is supported or based upon two or more considerations, if any one of them be op *524 posed to public policy the contract is void, unless so much ■of the promise as is based distinctly and solely upon the good consideration is separable from the remainder. Green-Rood on Public Policy, page 17.
In the case of Widoe v. Webb, 20 Ohio St. 431, it is said that, “When however, fora legal consideration, a party undertakes to do one or more acts, and some of them are unlawful, the contract is good for so much as is lawful, and void for the residue. Whenever the unlawful part of the contract can be separated from the rest, it will be rejected, and the remainder established. But this can not be done when one of two or more considerations is unlawful, whether the promise be to do one lawful act, or two or more acts, part of which are unlawful; because the whole consideration is the basis of the whole promise. The parts are inseparable. * * * * And it has been said with much force, that where parties Rave woven a web of fraud or wrong,it is on part of the duty of courts of justice to unravel the threads and separate the sound from the unsound. ’ ’
In the case of Spurgeon v. McElwain, supra, the builder of a building to be devoted to the keeping of a nine-pin alley, (which was unlawful), was not allowed to recover, on the grounds that it was an erection sui generis whose ordinary use in such places is unlawful, and that it would thereby tend to aid the owner in an illegal action, and therefore ought not to be assisted by the law.
In the case of McQuade v. Rosecrans, 36 Ohio St. 442, it was held that the consideration of a mortgage was entire, and a portion being illegal, the court would not aid in its foreclosure even for the legal part.
It was also held in the case of Sullivan v. Hergen (R. I.) 20 Atl. 232, that where a clerk was employed in running a grocery and tending bar, (tending bar being illegal), the clerk could not recover quantum meruit for his services in conducting the grocery part. The contract being illegal, was entirely void.
*525 The contract; therefore, set out in the second amended petition, providing for Morris’ services and for expenditure of moneys in acquiring right of way from West and Olay streets in the city of Troy to Statlers’ line being inseparably connected with the service and efforts of Morris as a member of council, and having a tendency to influence his action as such member of council, was contrary to public policy, and the doctrine “ ex turpi causa non oritur actio” applies.
The consideration being entire, it is not our duty to separate the sound from the unsound, but the Court will leave the parties where it finds them.
So far, therefore, as the evidence tended to support the contract set out in the petition,it was manifestly insufficient, for the cause of action which it tended to support arose ex turpi catisa.
But upon an examination of the whole record in the case we can not arrive at the conclusion that a verbal contract existed as claimed by the plaintiff.
To allow evidence of such verbal contract to be considered by the jury, it must appear either
(1) That the written instrnment of May 19, 1886, was nota contract, or
(2) That the subject-matter of the verbal contract was not included in such written contract or any of its modifications.
We are not unmindful of the rule which imposes upon the jury the duty of weighing conflicting testimony. But how stands the case upon the testimony of the plaintiff weighed in connection with the correspondence, contracts and documents introduced and submitted by him?
We do not deem it necessary to take up the different items of correspondence in detail, between Morris and Waite (representing the railway company,) and others which necessarily formed the res gestee in connection with the written contract in this case.
*526 All of the documentary evidence, all of the correspondence between Waite and Morris and Judge Sullivan, point with reasonable certainty to the truth and good faith of the-contract of May 19, 1886. The negotiation proceeded step by step in natural and usual ojder. The parties were dealing at arms length and in an adversary way. If the contract was intended as a blind, why all this dickering in private letters between Morris and Waite?
After several months conferring verbally and by letter, Morris writes to Waite on March 10, 1886, foreshadowing the written contract and settling the adversary character of their negotiations. He says: “In your letter to Mr. Sullivan and .in your congratulatory dispatch to me, it seems-impossible to satisfy your mind that $7,000 furnished by the railway company, and the $3,200 subscribed by citizens is sufficient to secure the right of way and damages, from. West street in Troy to Skinner’s south line. You, therefore, seem to insist upon ‘a guarantee. ’ * * Now, to settle this question of ‘guarantee,’ I submit for your consideraion he following: I will myself give bond in he sum of one hundred thousand dollars to save the company harmless against any further expenditure of money than $7,000, provided the said company will place the amount of $7,000, together with the amount (represented good beyond question) of the subscriptions of citizens in the hands of W. H. H. Dye, Mr. Allen, The First Natonal Bank of Troy or any responsble depositary in trust to be paid to me as needed in settling for said right of way and damages. I believe this is substantially your proposition when here. I will accept of it — this contemplates a line of road within the options heretofore taken by me and with a view of running by Allen & Wheeler’s mill. Should A, & W. fail or neglect to make satisfactory arrangements, I will agree to procure the ‘Hydraulic line’ to Statler’s south line and give bond accordingly.’’
*527 This letter Mr. Morris, in his testimony (on page 140 o "bill of exceptions) says was in good faith,and was intended to mean what it stated, and was not written as a blind. He says, however, that it was not acted upon.
It is true that it was not acted upon as a contract, but it was a step in the negotiations which led to the contract of May following; and being in good faith and in harmony with the purposes of the May 19th contract, it is an invaluable aid in determining whether the culmination of their informal negotiations was also in good faith.
Following this letter and the reply of Waite, Morris makes the draft of the contract of May 19th, which was submitted to Waite and Ramsey, and a modification appended. Morris signed the contract, and also the modification, and procured a guarantee to be signed by W. H. H. Dye and others. The contract and modification and guarantee were submitted to R. D. Marshall, president of the P. & T. Br. R. R. Co., who, before executing it on behalf of the company, wrote what is known as his letter- of construction of the contract. This letter of construction was accepted by Morris in writing, and the contract was executed by the company.
On September 17, 1886, the contract was again modified by releasing Morris from furnishing right of way north of the countynroad, forming Mrs. Dye’s south line.
The manner and formality attending the execution of this contract and its various modifications, together with the purpose expressed on its face, are inconsistant with the claim that it was. intended merely to deceive the public.
This question was presented to and considered by this court at a former term, and, among other things, it was said by Stewart, J., in deciding the case: “The contracts and letters between the parties wholly disprove the claim of the plaintiff that this was not the real contract between the parties, and indeed to accept the theory of the plaintiff’s counsel we must find not only that he and‘Mr. Waite were *528 engaged in deceiving the public, but in deceiving each other as to the deception.”
Morris, however, (page 151, bill of exceptions) says of the contract of May 19th: “That the purpose for which that writing was intended was in good faith, and if they had constructed the road with reference to this writing and the purpose for which it was drawn, there would have been no trouble here.”
In all the subsequent letters of Morris, as well as in his receipts for the consideration, this writing is referred to as a contract, and its terms the basis of liability of the parties.
We cannot conceive of any reason or pretext for the letter of construction of Marshall for the modification of September 17th, consistent with the claim of this contract being a blind to deceive the public; and it seems Morris undertook to give none. He says (page 168): ‘‘There was trouble and controversy, and I did not know what the result might be in the fix I was in having signed that paper, and that’s the result of that paper of September 17th, or the paper is the result of that feeling. ” The effect of that is, as we understand it, that although claiming the writing of May 19th was intented as a blind, yet there being trouble and controversy about it, Morris, in order to secure the modification of Septeraer 17th, was willing to and did sign that as a contract. We do not consider how far this might be an affirmance of the contract of May 19th, but refer to the admission and failure to give any satisfactory explanation of the modification of September 17th, as confirming the position taken by us as to the contract of May 19th. Into the contract of May 19th was merged all questions concerning the right of way therein stipulated for.
It is contended that for the services of Morris and money expended in purchasing property not included in the written contract, he is entitled to recover.
*529 The contract of May 19th requires Morris to “furnish” this right of way for a sum therein specified; and his services, as well as money expended in procuring this right of way, would be necessarily included in the contract price, and it would be inconsistent for Morris to assert a claim for services independent of the contract.
The material question, therefore, is: did Morris procure rights of way or make purchases not included in the contract? The right of way provided for in the contract is a continuous way from West and Clay streets in Troy to Statler’s south line on or near the Hydraulic, subject to the modification of September 17th.
We think the road was built and rights of way secured on the line contemplated in the written contract. Morris, however, claims for the price paid for the Kinkead and Sayer lots which were purchased prior to the execution of the written contract. He asserts that he made these purchases under a prior verbal contract. These tracts were much wider than needed for road way purposes, and it was claimed that Morris was to buy these tracts, take the title in his own name; the necessary amount was to^be used for right of way, the remainder was originally intended for depot purposes; but Morris denies he was authorized to sell the excess beyond the right of way, and account to the company.
Without going into details, we think this claim is clearly inconsistent with the letters and~the contract.
Waite, in his letter to Sullivan, calls his attention to the fact that in his estimate of cost of right of way the Morris’ (i. e. Kinkead and Sayer) land was left vacant. Morris, himself, answers this letter by his of March 10, 1886. If the Kinkead and Sayer's purchase was governed by a different contract, Morris would hardly have omitted reference to that fact in his letter, but instead of so doing, he, in line with Waite’s idea,proceeds to draw up a contract which provides for Morris receiving pay from the company for a fifty foot *530 strip across these tracts. In the letter of R. D. Marshall accepted by Morris, and which formed a[part of thejcontract of May 19th, it was provided that the brick [house on the Kinkead property should not pass to the railroad company, but should be removed by the company, free of expense to Morris, to the portion of the lot north of said way.
Afterwards, and without the assent of the" company, in fact without consulting it, Morris barters the remainder of the Kinkead property, subject to the contract of[May[19th, for western land.
This was inconsistent with the claim of Morris, and taken in connection with the provisions of the contract, it is clear to us that no such verbal contract was made or could have been asserted if made.
As to the contention that the contract of May 19, 1886, was not acted upon or carried out, we may say the evidence shows the contrary. Morris received the contract price, $10,200.00, and receipted for it as in full for contract of May 19, 1886, and except as to the modification of September 17, 1886, Moiris fails to show wherein the company failed to carry out the contract. It appears that the company acted under this contract and its various modifications. Morris also acted under it.
It therefore follows that the written contract of May 19, 1886, was the only contract between theplaintiff and the P. & T. Br. R. R. Co., which was acting for the C. H. & D. Co., and that the evidence fails to support the verbal contract claim, and on that ground the verdict is against the manifest weight of the evidence.
But it appearing from the pleadings and the testimony of Morris, together with the exhibits introduced as a part of his testimony, that the alleged contract claimed in the plaintiff’s petition was in violation of public policy, the trial court erred in not granting the motion of the plaintiff in error', and dismissing the action as requested.
W. M. Ramsey, H. H. Williams, Robert Ramsey and A. F. Broomhall, for plaintiff in error.
Byrkett & Gilbert, Calvin D. Wright, T. B. Kyle and Clyde & McPherson, contra.
The judgment of the common pleas court will therefore be reversed, and this court proceeding to render such judgment as the court of common pleas ought to have rendered, it is ordered that said motion be sustained and the petition dismissed.